**FILED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

MAY 2 9 2013

MATTHEW J. DYKMAN
CLERK

**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF NEW MEXICO**

IAN GARLAND,                    )
                               )
        Petitioner,             )        Cr. No. 2:11-cr-00487-RB
                               )
vs.                            )        Civ. No. 13-496 RB/GBW
                               )
UNITED STATES,                  )
                               )
        Respondent.             )

---

**MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE
OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

---

Ian Garland moves the Court to vacate his conviction and allow him to withdraw his plea. Alternatively, Mr. Garland moves the Court to vacate his sentence and order that Mr. Garland be resentenced. Mr. Garland is confined at Yankton Federal Prison Camp, P.O. Box 700, Yankton, SD 57078 and his BOP Register Number is 60687-051.

1.    (a) **Name and location of court that entered the judgment of conviction you are challenging:** United States District Court for the District of New Mexico, Las Cruces, New Mexico

      (b) **Criminal docket or case number (if you know):** 2:11-cr-00487-RB

2.    (a) **Date of the judgment of conviction (if you know):** May 24, 2012

      (b) **Date of Sentencing:** May 24, 2012

3.    **Length of sentence:** 60 months

4. **Nature of crime (all counts):** 18 U.S.C. § 371, Conspiracy (1 count); 18 U.S.C. § 924(a)(1)(A), False Statements in Connection with the Acquisition of Firearms and 18 U.S.C. § 2, Aiding and Abetting (6 counts); and 18 U.S.C. § 554, Smuggling Goods from the United States and 18 U.S.C. § 2, Aiding and Abetting (1 count)

5. **(a) What was your plea?** Guilty

   **(b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?** Mr. Garland pled guilty to the Conspiracy count and the six False Statement counts. The Smuggling count was dismissed.

6. **If you went to trial, what kind of trial did you have?** N/A

7. **Did you testify at a pretrial hearing, trial, or post-trial hearing?** No

8. **Did you appeal from the judgment of conviction?** Yes

9. **If you did appeal, answer the following:**

   **(a) Name of court:** Unites States Court of Appeal for the Tenth Circuit

   **(b) Docket or case number (if you know):** No. 12-2093

   **(c) Result:** Voluntarily withdrew appeal

   **(d) Date of result (if you know):** September 24, 2012

   **(e) Citation to the case (if you know):** N/A

   **(f) Grounds raised:** N/A

   **(g) Did you file a petition for certiorari in the United States Supreme Court?** No
   **If "Yes," answer the following:**

       **(1) Docket of case number (if you know):** N/A

       **(2) Result:** N/A

       **(3) Date of result:** N/A

    (4) **Citation to the case (if you know):** <u>N/A</u>

    (5) **Grounds raised:** <u>N/A</u>

10. **Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?** <u>No</u>

11. **If your answer to Question 10 was "Yes," give the following information:**

    (a) (1) **Name of court:** <u>N/A</u>

        (2) **Docket or case number (if you know):** <u>N/A</u>

        (3) **Date of filing (if you know):** <u>N/A</u>

        (4) **Nature of the proceeding:** <u>N/A</u>

        (5) **Grounds raised:** <u>N/A</u>

    (b) **If you filed any second motion, petition, or application, give the same information:**

        (1) **Name of court:** <u>N/A</u>

        (2) **Docket or case number (if you know):** <u>N/A</u>

        (3) **Date of filing (if you know):** <u>N/A</u>

        (4) **Nature of the proceeding:** <u>N/A</u>

        (5) **Grounds raised:** <u>N/A</u>

    (c) **Did you appeal to a federal appellate court having jurisdiction over action taken on your motion, petition, or application?**

        (1) **First petition:** <u>N/A</u>

        (2) **Second petition:** <u>N/A</u>

    (d) **If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:** <u>N/A</u>

12. **For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach**

**additional pages if you have more than four grounds. State the <u>facts</u> supporting each ground.**

**GROUND ONE:**

**(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):** Mr. Garland was a federally licensed firearms dealer operating under the business name of Chaparral Guns in Chaparral, New Mexico. In mid-2010, Mr. Garland began selling firearms to an individual named Blas Gutierrez and associates of Mr. Gutierrez who Mr. Gutierrez would sometimes bring to Mr. Garland's store.

    Between June 2010 and February 2011, Mr. Gutierrez and his associates purchased approximately 190 firearms from Mr. Garland. All of the firearms Mr. Garland sold to Mr. Gutierrez and his associates were first purchased by Mr. Garland from legitimate wholesale firearms dealers located in the United States and were not required to be registered on the National Firearms Registration and Transfer Record. Mr. Garland did not modify any of the firearms he purchased from these wholesalers before he sold them to Mr. Gutierrez and his associates.

    As a licensed firearms dealer, Mr. Garland was required to document his sales on a Firearms Transaction Record Form 4473. Among other things, this form required Mr. Garland to verify that the purchaser was lawfully allowed to purchase the firearm. Mr. Garland fulfilled this obligation in connection with all the firearms that Mr. Garland sold to Mr. Gutierrez and his associates. In other words, Mr. Garland only sold firearms to Mr. Gutierrez and his associates after he determined that those individuals were lawfully allowed to purchase the firearms and were not prohibited persons as defined by 18 U.S.C. §§ 922(g) and(n). Form 4473 also required the purchaser to attest that he was the "actual buyer" of the firearm, i.e., that he was not "acquiring the firearm(s) on behalf of another person."

4

A federal grand jury indictment was filed on March 8, 2011, charging Mr. Garland with conspiracy, six counts of aiding and abetting false statements in connection with the acquisition of firearms, and one count of aiding and abetting smuggling goods from the United States. Generally, the indictment alleged that Mr. Gutierrez conspired with Mr. Garland and others to utilize straw purchasers to purchase firearms from Mr. Garland for the purpose of trafficking them to Mexican drug organizations. As for the false statement counts, the government's theory was that Mr. Garland knew that Mr. Gutierrez and his associates were not the "actual buyers" of the firearms and that Mr. Garland knew that Mr. Gutierrez and his associates were purchasing the firearms on behalf of others. The government did not have any firm proof as to Mr. Garland's culpability. Rather, the government's theory rested on its belief that, given the circumstances, Mr. Garland should have known of the conspiracy and should have known that Mr. Gutierrez and his associates were not the "actual buyers" of the firearms.

Mr. Garland maintained his innocence to his trial counsel Francisco Mario Ortiz. Among other things, Mr. Garland maintained that he never agreed with Mr. Gutierrez or anybody else to violate the law and did not know the essential objectives of the conspiracy. Regarding the aiding and abetting false statement charges, Mr. Garland maintained to Mr. Ortiz that he always believed that Mr. Gutierrez and his associates were the "actual buyers" of the firearms. Mr. Garland acknowledged to his counsel that on a few occasions he allowed Mr. Gutierrez's associates to sign the Form 4473s when he had reason to believe that Mr. Gutierrez's associates were purchasing the firearms on behalf of Mr. Gutierrez. Mr. Garland believed that this fell within the spirit of the law because Mr. Garland believed that Mr. Gutierrez was the ultimate purchaser of the firearms and Mr. Garland knew that Mr. Gutierrez could legally purchase firearms from Mr. Garland.

Mr. Ortiz repeatedly told Mr. Garland that, because he violated the law by selling to Mr. Gutierrez's associates when he believed that Mr. Gutierrez was the "actual buyer" of the firearms, the government's case was strong and that the only thing Mr. Garland could do was plead guilty. Believing that his trial counsel would not mount a defense and feeling desperate, Mr. Garland pled guilty on July 21, 2011 to the conspiracy and the six aiding and abetting false statement charges. The plea agreement required Mr. Garland to admit that he "aided and abetted the straw purchases of approximately 193 firearms . . . having reason to know that these firearms were illegally destined to people in Mexico." In addition, pursuant to the plea agreement Mr. Garland and the government stipulated that an 8-level enhancement pursuant to § 2K2.1(b)(1)(D) of the Guidelines and a 4-level enhancement pursuant to § 2K2.1(b)(5) of the Guidelines applied. On December 16, 2011, Mr. Garland moved to withdraw his plea. The Court denied Mr. Garland's motion on January 24, 2012.

Mr. Ortiz declined to be present when Probation interviewed Mr. Garland for his presentence report ("PSR"). In the PSR, Probation determined that Mr. Garland's base offense level should be 18 pursuant to § 2K2.1(a)(5) of the Guidelines on the ground that (at least some of) the firearms Mr. Garland sold were "machineguns" as defined by 26 U.S.C. §§ 5845(a)(6) and (b). Probation adjusted Mr. Garland's offense level upwards 8 points pursuant to § 2K2.1(b)(1)(D) of the Guidelines on the ground that "Mr. Garland was directly involved in selling, under false presentences [sic] a total of 193 firearms." Probation also adjusted Mr. Garland's offense level upwards 4 points pursuant to § 2K2.1(b)(5) of the Guidelines on the theory that Mr. Garland knew or had reason to believe that his conduct would result in the firearms in question being transferred to an individual "whose possession or receipt of the firearm would be unlawful; or . . . who intended to use or dispose of the firearm unlawfully." Finally, applying a 3 level downward adjustment pursuant to § 3E1.1 of the Guidelines, Probation determined that Mr. Garland's total offense level was 27.

Combined with a criminal history category of I, Probation concluded that Mr. Garland's advisory guidelines sentencing range was 70-87 months. The statutory maximum of the crimes to which Mr. Garland pled guilty, however, was 60 months. Mr. Garland's trial counsel did not file any objections to the PSR.

At sentencing on May 24, 2012, Mr. Ortiz acknowledged that Mr. Garland aided and abetted the violation of 18 U.S.C. § 924(a)(1)(A) on six occasions (Counts 5, 7, 12, 15, 36, and 40) because Mr. Garland sold to individuals with reason to know that the firearms would be transferred to Mr. Gutierrez: "There were six instances where he violated that regulation by doing what he did, in terms of knowing that the guns were for [Mr. Gutierrez], a known client, who could easily legally buy it, he sells it to this person, knowing that this person is probably going to give it to Mr. Gutierrez. Not that this person is going to take it to Mexico or anything like that." (May 24, 2012 Sentencing Transcript ("Tr.") (attached as Exhibit A) at 16:21-17:2). Mr. Ortiz thus argued that Mr. Garland's culpability was limited because he was not "a totally knowing facilitator of knowing what they were doing, knowing exactly what was going on." (*Id.* at 9:16-:18; *see also id.* at 19:15-20:2 (arguing that Mr. Garland's culpability was limited to allowing others to purchase firearms on behalf of Mr. Gutierrez).) Mr. Ortiz acknowledged that Mr. Garland pled guilty to conspiracy and aiding and abetting the straw purchase of 193 firearms, but only because "in hindsight" did Mr. Garland know that all of the purchases by Mr. Gutierrez and his associates were straw purchases. (*See id.* at 35:21-:23, 38:15-39:5.) Mr. Ortiz made "it clear that Mr. Ian Garland did not know that there was [sic] 190 straw purchases." (*Id.* at 38:18-:20; *see also generally* Def's Sentencing Memo. (Doc. 226).)

When sentencing Mr. Garland, the Court relied on the fact that Mr. Garland sold firearms to Mr. Gutierrez's associates "kn[owing] that those guns were for Mr. Gutierrez." (Tr. at 47:8-:17.) The Court acknowledged that whether Mr. Garland knew that Mr. Gutierrez intended to do with the firearms, i.e., illegally transfer them

to Mexico, was "not a part of this record." (*Id.* at 47:16-:17) The Court accepted the PSR's calculations and, pursuant to Section 5G1.1(a) of the Guidelines, sentenced Mr. Garland to 60 months of imprisonment. (*Id.* at 49:17-:22.)

Mr. Garland received ineffective assistance of counsel in violation of the Sixth Amendment to the U.S. Constitution in that his trial counsel:

A.      Advised Mr. Garland to plead guilty and enter into a plea agreement in which Mr. Garland admitted that he "aided and abetted the straw purchases of approximately 193 firearms . . . having reason to know that these firearms were illegally destined to people in Mexico." Mr. Garland's trial counsel was ineffective because, although Mr. Garland admitted to allowing others to purchase firearms on Mr. Gutierrez's behalf on a few occasions, Mr. Ortiz knew that Mr. Garland consistently denied knowing, or having reason to know, that the firearms were destined for Mexico. In addition, to convict Mr. Garland of conspiracy, the government would have had to prove that Mr. Garland specifically intended to advance or further the unlawful object of the conspiracy. Because the government's case pertaining to Mr. Garland's mens rea was incredibly weak, Mr. Garland's counsel was ineffective in advising Mr. to plead guilty to the conspiracy charge.

Furthermore, Mr. Garland's trial counsel was ineffective in advising Mr. Garland to stipulate to the enhancements pursuant to §§ 2K2.1(b)(1)(D) and (b)(5) of the Guidelines. Only 44 firearms are attributable to the six counts in which Mr. Garland acknowledged selling to individuals having reason to know the firearms may ultimately be transferred to Mr. Gutierrez. As such, Mr. Garland should only have received a 6-point increase to his base offense level pursuant to § 2K2.1(b)(1)(C) instead of an 8-point increase pursuant to § 2K2.1(b)(1)(D). Finally, Mr. Ortiz was ineffective in advising Mr. Garland to stipulate to the 4-point enhancement pursuant to § 2K2.1(b)(5). As reflected in Mr. Ortiz's colloquy with the Court at sentencing,

Mr. Garland only knew or had reason to believe that the firearms would be transferred to Mr. Gutierrez, not to Mexico. Because Mr. Gutierrez was not prohibited from owning firearms, § 2K2.1(b)(5) should not have applied. Mr. Garland was prejudiced because, but for Mr. Ortiz's professional errors, Mr. Garland would not have entered into the plea agreement and pled guilty.

   **B.**   Failed to object to the PSR and Probation's determination that Mr. Garland's base offense level was 18 pursuant to § 2K2.1(a)(5). None of the firearms sold by Mr. Garland can be defined as a "machinegun" pursuant to 26 U.S.C. § 5845. (*See* May 13, 2013 Letter from Gary Ainsworth to Todd A. Coberly (attached as Exhibit B).) Rather, these firearms were semi-automatic weapons and were not required to be registered on the National Firearms Registration and Transfer Record. *See* 26 U.S.C. § 5861(d). Because the firearms in question were not "machineguns" as defined by § 5845 and because Mr. Gutierrez was not a "prohibited person," *see* U.S.S.G. § 2K2.1(a)(6), Mr. Garland's base offense level should have been 12, *see* U.S.S.G. § 2K2.1(a)(7). Accordingly, even if Mr. Garland did not receive ineffective assistance of counsel in regard to his plea, Mr. Garland received ineffective assistance of counsel in relation to his sentencing. There can be no strategic reason for not objecting to Probation applying § 2K2.1(b)(5) instead of § 2K2.1(b)(7). Mr. Garland was prejudiced because, had Mr. Ortiz raised the objection, Mr. Garland's total offense level would have been 21, resulting in a guidelines range of 37-46 months, which is well-below the sentence of 60 months that Mr. Garland received.

**(b) Direct Appeal of Ground One:**

   **(1) If you appealed from the judgment of conviction, did you raise this issue?**
      No

   **(2) If you did not raise this issue in your direct appeal, explain why:** Mr. Garland's ineffective assistance of counsel claims were not raised on direct

appeal because there was no record, making the issue inappropriate for direct appeal.

**(c) Post-Conviction Proceedings:**

    **(1)** **Did you raise this issue in any post-conviction motion, petition, or application?** No

    **(2)** **If your answer to Question (c)(1) is "Yes," state:**

        **Type of motion or petition:** N/A

        **Name and location of the court where the motion or petition was filed:** N/A

        **Docket or case number (if you know):** N/A

        **Date of the court's decision:** N/A

        **Result (attach a copy of the court's opinion or order, if available):** N/A

    **(3)** **Did you receive a hearing on your motion, petition, or application?** N/A

    **(4)** **Did you appeal from the denial of your motion, petition, or application?** N/A

    **(5)** **If your answer to question (c)(4) is "Yes," did you raise this issue in the appeal?** N/A

    **(6)** **If your answer to Question (c)(4) is "Yes," state:**

        **Name and location of the court where the appeal was filed:** N/A

        **Docket or case number (if you know):** N/A

        **Date of the court's decision:** N/A

        **Result (attach a copy of the court's opinion or order, if available):** N/A

**(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** <u>N/A</u>

**13.  Is there any ground in this motion that you have not previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:** <u>Yes. Mr. Garland's ineffective assistance of counsel claims have not previously been presented to a federal court because of the lack of a record, making them inappropriate to raise on direct appeal.</u>

**14.  Do you have any motion, petition, or appeal now pending (filed and not decided yet) in any court for the judgment you are challenging?** <u>No</u>

   **If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised:** <u>N/A</u>

**15.  Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:**

   **(a) At preliminary hearing:** <u>N/A</u>

   **(b) At arraignment and plea:** <u>Francisco Mario Ortiz, 715 E. Idaho #1C, Las Cruces, NM  88001</u>

   **(c) At trial:** <u>N/A</u>

   **(d) At sentencing:** <u>Francisco Mario Ortiz, 715 E. Idaho #1C, Las Cruces, NM  88001</u>

   **(e) On appeal:** <u>Jennifer L. Attrep, 1322 Paseo de Peralta, Santa Fe, NM  87501</u>

**(f) In any post-conviction proceeding:** N/A

**(g) On appeal from any ruling against you in a post-conviction proceeding:** N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time? Yes

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? No

    (a) If so, give the name and location of court that imposed the other sentence you will serve in the future: N/A

    (b) Give the date the other sentence was imposed: N/A

    (c) Give the length of the other sentence: N/A

    (d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future? N/A

18. **TIMELINESS OF MOTION:** If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion. N/A

**Therefore, movant asks that the Court grant the following relief:** Appoint CJA counsel, provide an evidentiary hearing on the issues raised in this motion, and either vacate Mr. Garland's conviction and allow him to withdraw his plea or vacate Mr. Garland's sentence and order that Mr. Garland be resentenced.

**or any other relief to which movant may be entitled.**

Signature of Attorney (if any)
Pursuant to *Duran v. Carris*, 238
F.3d 1268, 1273 (10th Cir. 2001)

## DECLARATION UNDER PENALTY OF PERJURY

I, Ian Garland, declare under penalty of perjury that I am the Plaintiff in this action, that I have read the above pleading, and that the information contained therein is true and correct.

Executed at <u>Yankton Federal Prison Camp</u>, on <u>MAY-18TH 2013</u>
                  (Location)                      (Date)

**Signature of Movant**

# Exhibit

# A

| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE DISTRICT OF NEW MEXICO |
| 2 | |

| 3 | UNITED STATES OF AMERICA, | ) |
| | | ) |
| 4 | Plaintiff, | ) |
| | | ) |
| 5 | vs. | ) NO: CR 11-487 RB |
| | | ) |
| 6 | IAN GARLAND, | ) |
| | | ) |
| 7 | Defendant. | ) |

8

9                                **SENTENCING**

10

          Transcript of Proceedings before THE HONORABLE
11 ROBERT C. BRACK, United States District Judge, held in the
city of Las Cruces, Doña Ana County, New Mexico, commencing
12 on Thursday, May 24, 2012, at 9:54 A.M. and concluding at
11:47 A.M.
13

14
Appearances of Counsel:
15
    For the United States:
16
          Assistant United States Attorney
17           Nathan Lichvarcik, Esq.

18     For the Defendant:

19           Court-appointed Counsel
          Francisco Mario Ortiz, Esq.
20
Also Present:  Thayenda White, Probation
21
    (Proceedings recorded by machine shorthand and
22 transcript produced by Computer-Aided Transcription.)

23           Vanessa I. Alyce, RPR
        Federal Official Court Reporter
24           NM CCR #259

25

1   "Yes, here is the record.  In fact, he came yesterday.  Yes,

2   he came two days ago.  Here is the record."  He would have

3   done that.

4        So the fact that he didn't call immediately --

5   and that is a problem because that was a problem in the

6   facts of this case in terms of him pleading and part of the

7   whole thing of "reason to know."  Why?  Because you can take

8   any fact and turn it around and make it a negative fact to

9   imply all this illegal stuff or whatever to make you guilty

10   of a crime.  Or you can take the same fact and say, "Well,

11   let's look it in a positive way and perhaps it's not that

12   bad," which is why I went through the whole thing with that

13   bank robbery.

14        So was he a facilitator in the -- bottom line,

15   because he did sell them the guns?  Yes.  And what they did

16   with it?  Apparently, yes.  But was he a totally knowing

17   facilitator of knowing what they were doing, knowing exactly

18   what was going on?  No.  Did he -- was there facts that

19   maybe led him to not be as suspicious?  The guy is in

20   uniform.  He has a police car.  He's the mayor of the city.

21   He's the police chief.  They're coming in a police car.

22   Wouldn't that kind of like justify, offset my suspicions and

23   make me feel like, "Well, you know, this must be okay"?

24        Plus the added fact -- and the government likes

25   to say "over this many guns, over 200 guns, or close to --

1    they responded to.

2         The nature and circumstance of the offense,

3    respect for the law, and just punishment.  Again, they try

4    to -- they bring in the codefendants, all their wrongs and

5    deeds known and everything else; don't emphasize, just

6    simply should have had a reason to know.  And he didn't

7    actually do that.  He did this.

8         Selling 193 high-powered firearms to "known"

9    straw purchasers.  Again, that implies he sold 193 times, to

10   known straw purchasers, high-powered firearms.  Again, that

11   number is not correct.  When you deduct all the ones that,

12   during that first year or whatever where he probably

13   wouldn't have known anything anyway, by the time you get to

14   the point where he should have known, that number then

15   should be decreased significantly.

16        And "known" straw purchasers.  You can believe

17   that, if they had evidence of 50 straw purchases, where they

18   could show that this was a violation of the rules, that's

19   what he would have been charged with.  They had evidence.

20   And they knew everything because they were tapping the

21   phones.  They knew every time they came to buy.  There were

22   six instances where he violated that regulation by doing

23   what he did, in terms of knowing that the guns were for

24   Blas, a known client, who could easily legally buy it, he

25   sells it to this person, knowing that this person is

1     probably going to give it to Blas.  Not that this person is

2     going to take it to Mexico or anything like that.  In fact,

3     that assumes that all these good people who came -- most of

4     them were very good people.  This olderly [sic] couple --

5     this elderly couple and stuff -- assumes that he knows that

6     they're Bonnie and Clyde or whatever and could do something

7     like that.  So that's an exaggeration and that doesn't fit

8     there.

9          And then they go -- they say that he was, indeed,

10    because he was a principal agent of the federal enforcement

11    as a firearms dealer -- that's a big thing to them, and I'm

12    sure it is to the court.  Now, again, I must emphasize, he

13    did everything legally.  He tried to do everything the way

14    it's supposed to be done.  And he was new at the game.  He

15    had just started his business when these people came to him.

16    He did everything that -- he believed he was doing it in the

17    legal way.  This one thing that he did by doing the straw

18    purchases these six times, even then, it could be seen that,

19    okay, may have bent it a little bit, but we all bend the law

20    a little bit sometimes when we don't see that it's really

21    that intent.  It's okay.  Why is it okay?  Because he could

22    have legally got it.  These people legally could have done

23    it.  Everything is above here.  This seems okay.  "Okay,

24    I'll help you a little bit.  You're my client.  You're a

25    good client."

1          (Reading) "Seen in the light...defendant's

2     conduct in this conspiracy is even more serious than the

3     other defendants."  Well, how is that?  "Seen in the light"?

4     Everything I just explained is more serious than what all

5     these other people were doing?  They know what they're

6     doing.  They are getting paid for what they're doing.

7     They -- there's no "reason to know."  That, for the

8     government, means that Ian is more serious, more culpable

9     than these people?

10          (Reading) "(b), Defendant's history and

11     characteristics."  The government -- first of all, they up

12     the number to 200 firearms.  "Dangerous conspiracy; helping

13     numerous individuals lie along the way."  Okay.  That goes

14     back to this form, this issue of this form (indicating).

15     This person -- these people, six people, came and checked a

16     box saying that they were buying the guns for themselves.

17     Are they saying that Ian told them, "Hey, look, there is a

18     box here and you've got to lie and you've got to do --" no,

19     he didn't do that, and that's not what they're saying.

20     They're saying that, after the fact, "We have this form.

21     They checked that out.  He knew the gun was for Blas."

22          Yes, he did.  Did he help them do that?  No.  Did

23     he hold their hand?  Did he even suggest to Blas, "Hey, why

24     don't you bring some other people to do this"?  No.  These

25     people came.  That whole relationship, this incident, that's

1    what happened.  They turn it into "he -- he facilitated, he
2    helped them lie" and all this other stuff.  "200 guns" now.

3             And then, they go into the fact that he's already
4    benefited because he has no prior criminal history.  He has
5    a Category I, so he's already benefited.  I don't think so.
6    When you're in Category I, it just means -- the difference
7    between that and II is that your punishment is not going to
8    be increased.  It doesn't mean that we're going to decrease
9    it now because you're in Category I.  So that's not
10   completely true.  He has not already benefited from being in
11   Category I.  It just means that he's not going to be
12   punished more because he has no prior convictions.

13            And then they go on again to exaggerate again,
14   (reading) "...clearly making a statement he's served as a
15   supplier for a Mexican cartel."  Well, now, he's supplying
16   to Mexican cartels?  I guess, directly, because it doesn't
17   say anything about these people.  It doesn't say, well, it's
18   going -- it just says now that "he's serving as a supplier
19   for the Mexican cartel."

20            Again, the exaggeration, the bias, the intent to
21   bias the court, bias the judge in terms of making him look
22   every bit as criminally intent and everything else as these
23   codefendants and the full knowledge, when they, themselves,
24   know that the best they have is he should have had reason to
25   know.

1    I've discussed.

2           And if Your Honor has no further questions,

3    that's all I have.

4           THE COURT:  Thank you.

5               (Discussion off the record.)

6           Mr. Ortiz?

7           MR. ORTIZ:  Your Honor, just a few things.  We

8    don't deny the fact of what the government says, but I'd

9    like to point this out:

10          Even in a drug case where the defendant doesn't

11   know how much marijuana is in --he's transporting or

12   whatever, in the end, he has to admit that he illegally

13   transported 190 kilos or whatever, even though he didn't

14   know.  You have to, in the end, in hindsight, because he now

15   knows how much marijuana there was there.  And the question

16   is, "Do you deny that there was this much marijuana in

17   there?"

18              "No."

19          Okay.  So you have to plead guilty to this much

20   marijuana.

21          In hindsight, yes, all of these guns, in

22   hindsight, were straw purchases because of what Blas and

23   them did with them.  But if you look at it as I tried to

24   show step by step in my Presentence Report [sic], there's no

25   way he could have known initially or whatever that this was

1    purpose?

2              MR. ORTIZ: At that point, Your Honor, there's no

3    way completely that Ian could have known that. That's what

4    I'm saying, yes. I'm saying, in hindsight, we can know

5    that. I'm saying that the government said that because the

6    plea agreement said "190" that means he knew that this

7    happened; he did 190 straw purchases. No, that didn't

8    happen. In hindsight, yes, it happened because, in

9    hindsight, we now know there was 190 guns that these people

10   used in this way, so therefore, all of them were straw

11   purchases.

12             THE COURT: Given the factual basis that's

13   contained in the plea, itself, at page 4, what's the point

14   of this conversation?

15             MR. ORTIZ: Well, simply to point out that,

16   again, because we're using so many guns and because he made

17   the point that -- again, to reinforce that he knew 190 straw

18   purchases, all I'm trying to say, Your Honor, is to make it

19   clear that Mr. Ian Garland did not know that there was 190

20   straw purchases. He did some and because of how he did it

21   and what he did, yes. Because those facts support that, he

22   had to plead, yes, but not that way and not in that tone or

23   that picture, the way it's being portrayed, Your Honor.

24   That's all. He's guilty and he did that. And there was

25   that reason and -- but the way it's being portrayed, that

1   190 guns that he actually knew were straw purchases and that

2   he actually knew it went to the Mexican cartel supplier for

3   Mexico -- all I'm trying to do is put other side of the coin

4   in the best light for my client because the government has

5   put it in the worst light for the government.

6          THE COURT:  But the government isn't painting any

7   picture that Mr. Garland didn't paint himself already in the

8   plea agreement.  The factual basis says (reading), "During

9   that time, I aided and abetted the straw purchase of

10  approximately 193 firearms."  That's not the government

11  talking.  That's him talking.

12         MR. ORTIZ:  That's right.  And when the defendant

13  stands here and says, "Yes, I transported 190 kilos of

14  marijuana illegally," that's him talking, but that's in

15  hindsight because he now knows there was 190 kilos.

16         THE COURT:  Move on.

17         MR. ORTIZ:  Thank you.

18         He does know Mexico in this way:  He knows Mexico

19  has cheap prescription drugs.  He knows his wife is sick.

20  He knows he can go to Mexico and get cheap drugs.  And

21  that's why he was going to Mexico.  And that's how he knows

22  Mexico.

23         The financial gain, which, again, is being

24  stressed -- and yes, we do admit that because we're not

25  saying he did this as a favor for Blas.  He made some money.

1          THE COURT:  -- and I pray that she gets all of
2     the help that she needs as this continues.

3          I am going to impose the sentence of 60 months.
4     And it's a tough sentence.  No doubt it is.  I find myself
5     struggling.  The fact is Ian Garland is -- I think I
6     describe you in a moment as an otherwise kind-hearted and
7     perhaps gullible man.  But here's the thing:

8          On multiple occasions, over an extended period,
9     Mr. Gutierrez would call and place an order.  And when told
10    the guns were ready or that they had arrived, he would tell
11    you -- and I went back through the record.  This wasn't just
12    once or twice, but on multiple occasions, he would say,
13    "Someone else will be over to pick them up or to consummate
14    the purchase to sign the paperwork," however he described
15    it, but you knew that those guns were for Mr. Gutierrez.
16    Whether you knew any other plan he had for them, that's not
17    a part of this record.

18         I was concerned about the ATF and their
19    involvement with you.  You talked about it, "If they had
20    just told me, if they had just done something more than what
21    they did," but the only reference I found to your
22    interaction with ATF in this matter was on February 23rd of
23    2011.  And you were arrested just 17 days later, so -- and
24    the in the meantime, they had asked you to call about
25    Mr. Gutierrez, and you didn't.

1          This is a -- will be a difficult time.  It has

2   been a difficult time for you to this point.  And I just

3   pray that the time is spent profitably for you in terms of

4   coming to grips with your responsibility and taking

5   advantage of whatever opportunities there might be at the

6   Bureau of Prisons.

7          And I will -- I'm glad to tell you that I gave

8   serious consideration to the arguments that your counsel

9   made to -- and I was hard-pressed to come to this point,

10  given the fact of your lack of criminal history and

11  honorable service; the fact that you became a citizen.  But

12  ultimately what made the decision for me is this terrible

13  supply chain that had in it a critical link.  And that was

14  you.  And that's the basis for my decision.

15         I pray grace and God's blessing on you and your

16  family in the meantime.

17         I'll accept the plea agreement in this case.

18  I've reviewed the Presentence Report factual findings and

19  considered the Sentencing Guideline applications.  The

20  Offense Level is 27.  The Criminal History Category is I.

21  Pursuant to 5G1.1, the Guideline imprisonment sentence is 60

22  months.

23         I note that Mr. Garland conspired with others to

24  smuggle goods from the United States and made false

25  statements for the acquisition of firearms.

# Exhibit
# B



May 14, 2013

Mr. Todd A. Coberly
Coberly & Attrep, LLLP
1322 Paseo de Peralta
Santa Fe, NM 87501

Re: USA v. Ian Garland

Dear Mr. Coberly,

1. I am a retired US Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Senior Special Agent. I retired from ATF on December 31, 2008. As of January 1, 2009 I have worked full time as a consultant in criminal and civil cases and as a private investigator. I have testified in United States District Court as an expert in firearm related cases.

2. Details of my training and experience are described in my resume (*Exh. 1*). Additionally, I maintain firearm expertise with my collection of firearms; firearms reference materials and hand loading ammunition.

3. I reviewed paragraphs 1 - 15 and paragraph 136 of the PRESENTENCE INVESTIGATION REPORT, UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO UNITED STATES vs. IAN GARLAND, 2:11CR00487-005RB, Sealed Document, dated October 27, 2011.

4. Paragraphs 1 – 15 indicate that the Indictment and/or Information(s) charged violation(s) of 18 U.S.C. § 2, 371, 554, and 924(a)(1)(A). Based on paragraphs 1 – 15 and information I received from you, it is my understanding that no charges were filed in this case under 26 U.S.C. § 5861 involving "machineguns" as defined by 26 U.S.C. § 5845.

5. Paragraph 136 in part states, "*According to ATF investigative materials, the AK-47 pistol type firearms involved in this case were (1) capable of accepting high-capacity magazines, meaning magazines that can hold numerous rounds of ammunition, and (2) the firearms were easily convertible to fully automatic mode, meaning the firearm will continue to load and fire rounds of ammunition as long as the trigger is activated or until the firearm runs out of ammunition. Therefore, a base offense level of 18 is applicable.*"

6. I reviewed the list you provided me of firearms that Mr. Garland allegedly sold (*Exh. 2*). I noted that none of these firearms are designated as "machineguns".

7. Based on information I received from you it is my understanding (1) that Mr. Garland received these firearms (*Exh. 2*) from legitimate wholesalers in lawful transfers and did not modify any of the firearms before selling them to certain individuals named in the Presentence Report and (2) that ATF did not classify any of these firearms as "machineguns".

8. Based on my training and experience and review of the above documents I have not seen evidence that would indicate the firearms contained in *Exhibit 2* are "machineguns" as defined by 26 U.S.C. § 5845 and thus required to be registered in the National Firearms Registration and Transfer Record (NFRTR) as required by 26 U.S.C. § 5861(d).

9. I am not aware what information the writer of the Presentence Report relied upon to conclude in effect that because the AK-47 pistol type firearms were "easily convertible to fully automatic mode" they were "machineguns" as defined by 26 U.S.C. § 5845.

10. It is my knowledge, training, experience and opinion that a firearm: (1) not described in 26 U.S.C. § 5845; (2) not subject to registration on the NFRTR; and (3) received by a Federal Firearms Licensee (FFL) in a lawful transfer from another FFL, cannot be classified as a "machinegun" solely on a Probation Officer's belief that the firearm is "easily convertible to fully automatic mode".

Gary L. Ainsworth

# Exhibit
# 1

## CURRICULUM VITAE

## Gary L. Ainsworth

**A retired Federal Criminal Investigator/Special Agent with over twenty years of investigative and witness experience in a variety of cases including complex and historical conspiracies, capital murder investigations, racketeering (RICO), wiretap investigations, firearm and related violence in furtherance of drug trafficking crimes, criminal street gang investigations, explosive and arson cases, with demonstrated expertise in search and seizure warrant applications and executions, complex case management; use and control of informants, cooperating witnesses and defendants; undercover operations, surveillance operations (electronic and physical), witness interviews and statements; and evidence collection and management.**

1/1/2009 - Present    Provide consulting, investigation (licensed private investigator) and testimony in criminal and civil cases involving drugs (includes Title III), firearms, violent and/or sex offenses, crimes in Indian Country, abuse, white collar, regulatory and licensing issues and traffic; includes work and testimony as an expert witness.

In 2011 I was hired by a New Mexico State House of Representatives subcommittee's attorney to conduct preliminary investigation regarding allegations against Public Regulation Commissioner Jerome Block Jr. (pursuant to scheduled impeachment proceedings).

I was listed in the "Acknowledgments" section of "THE BLACK HAND", a "Los Angeles Times Bestseller" book about the Mexican Mafia; authored by Chris Blatchford, an investigative reporter and nine-time Emmy Award winner and Peabody Award recipient.

12/31/2008    Retirement date as an ATF Senior Special Agent.

2002 to 2008    **Senior Special Agent**
ATF
Albuquerque Field Office
Albuquerque, New Mexico

A Federal Criminal Investigator/Special Agent whose primary duty was the reduction of violent crime through the enforcement of federal (and to a lesser degree, state) firearm, conspiracy, related narcotics, illegal firearm trafficking, arson and explosive statutes.

Duties included:
- making felony arrests (with and without warrants); preparing and executing warrants (suspects were primarily armed felons and/or drug dealers)
- obtaining evidence (including physical, electronic, photographic, witness and suspect statements)
- conducting surveillances (fixed, mobile, electronic and photographic)
- crime scene processing
- preparing and presenting criminal case reports to the United States Attorney and District Attorney for prosecution
- preparing and executing search and arrest warrants; and making warrantless arrests and searches

Part of this time period included assignment to the Violent Crime Interdiction Team in Albuquerque, NM. The primary focus of this team was the investigation and prosecution of armed felons and drug dealers and their suppliers of firearms.

- As part of this team I was involved in numerous operations involving the purchases of controlled substances; during the time period of 2005 – 2006 I personally made my last undercover purchase of crack cocaine as a government agent.
- I continued to investigate armed drug dealers; and was involved in informant purchases of controlled substances up until my retirement (2008).

During this period I was also an ATF Certified Explosives Specialist (CES). As such my duties included:

- post-blast investigations
- assisting state/local bomb squads and other ATF agents in the investigation of explosions and thefts of explosives
- maintaining the ATF explosive magazines
- providing safe disposal of explosive materials
- assignment as the ATF representative to the Albuquerque, New Mexico Police Department Bomb Squad

Cases highlighting my experience and expertise, as an investigator/case agent, during this time period include:

**Case number 1:06-CR-00051-JAP, US District Court, District of New Mexico, US v. Brown, et al**

- This case involved the conspiracy to steal; the theft of, the transporting and secreting of approximately 500 pounds of high explosives.

- As case agent/lead investigator I responded to the initial call out and conducted, directed and participated in crime scene processing; the successful development of leads; witness interviews; the use of electronic, airborne, and physical surveillance; the development of cooperating defendants; the application for and execution of warrants; personally directing and carrying out the high risk surveillances and arrests (warrant and warrantless) of armed and dangerous, drug abusing, felonious suspects.
- The explosives were recovered; taped confessions and arrests were made within one week of the initial call out.
- The case resulted in all five suspects pleading guilty; no suppression motions were filed in this case. This case received national media attention; and according to ATF and FBI senior management the White House was briefed on the investigation.
- As a result of this case I was awarded a citation by the US Attorney's Office, District of New Mexico.

**Case number 1:09-CR-01725- 001BB, US District Court, District of New Mexico, US v. Martin Lucero**

- This case involved the attempted use of an incendiary device to destroy a company's business office. As case agent I was involved in the initial call out and crime scene processing; witness and suspect interviews and evidence collection.
- This case involved the collection and use of DNA evidence.
- This case involved a crime that occurred in July 2006; in October 2009 the suspect pleaded guilty to Attempt to Use fire to Destroy Property in Interstate Commerce; this case was adjudicated after my retirement date from ATF.

**Case number 1:07-CR- 01010-JEC-1, US District Court, District of New Mexico, US v. Perkins et al**

- This case involved the crimes of Interference with Commerce by Threats or Violence; Discharge of Firearms During and in Relation to a Crime of Violence; and Felon in Possession of Ammunition.
- The subject was convicted by a jury and sentenced to a term exceeding life imprisonment.

Throughout my career as an ATF Agent my duties included:

- routinely testifying in courts (primarily United States District Court but occasionally in New Mexico State Courts)
- conducting background investigations of subjects and suspects of federal investigations; including researching, locating and obtaining police, court, public, employment, residency and motor vehicle records
- managing confidential informants;
- meetings with state and local prosecutors and defense attorneys
- maintaining quarterly qualification with issued firearms and required qualifications in defensive tactics and arrest techniques

| 1988 –2002 | **Special Agent/Senior Special Agent** |
| | ATF |
| | Albuquerque Field Office |
| | Albuquerque, New Mexico |

The majority of cases during this time involved armed narcotic traffickers and violent street gang members.

During this time period:

- Completed over twenty undercover meetings/purchases as an "undercover agent". These transactions involved cocaine (powder and crack), LSD, marijuana and illegal firearms; resulting in successful prosecutions in federal and state court.
- Additional assignments included numerous United States Secret Service details involving security for presidents, presidential candidates and family members of presidents and presidential candidates.
- September 2000 assignment to a security detail for a foreign head of state at the United Nations Convention in New York City.
- Assisted the Albuquerque Police Department Homicide Unit in gang related homicide investigations.

**A case highlighting my expertise, as case agent, during this time period is case number CR 95-538 MV, US District Court, District of New Mexico, US v Gonzales, et al. (known as the Sureno 13 RICO Case).**

- This multi-year case involved over twenty co-conspirators, charged with crimes including Racketeering, Murders, Attempted Murders, Firearm and Narcotic violations.
- The Chief United States District Court Judge characterized this case as the most complex case in the District.
- The United States Attorney General certified certain defendants in this case for capital punishment.
- This case involved a historical conspiracy; a proactive investigation utilizing cooperating informants (under extremely difficult circumstances) and cooperating defendants; electronic surveillances (including Title III), video surveillances, physical surveillances; witness relocations; arrests and searches (with and without warrants); subpoenas, and testimony.
- Awarded the International Narcotic Enforcement Officers Association, Commendation Award, for the year 1999 and the Investigative Excellence Award by the Federal Law Enforcement Officers Association, for the year 2000, for work in this investigation.
- This case was the subject of intense media coverage in Albuquerque, NM; additionally it was the subject of a multi-segment story by a Los Angeles, CA television channel.

## EDUCATION

| 1984- 1987 | **University of Louisville** |
| | Louisville, Kentucky |
| | Bachelor of Science Degree (BS); Police Administration |

4

{With High Honors}

1987        **Louisville Fire Department, Arson Squad**
Louisville, Kentucky
Law Enforcement Internship

## PROFESSIONAL TRAINING RECEIVED

| | |
|---|---|
| 2008 | ATF Tazer certification |
| 1999 | ATF Firearms Trafficking Techniques |
| 1996 | Advanced Gang Conference, National Law Enforcement Institute, San Francisco, CA |
| 1993 | Clandestine Drug Lab Investigation, Clandestine Laboratory Investigators Association, Las Vegas DEA, Las Vegas, Nevada |
| 1989 | ATF New Agent Training Academy, Federal Law Enforcement Training Center, Glynco, Georgia |
| 1988 | Hate Groups on the Extreme Right and Left Seminar, New Mexico Department of Public Safety |
| 1988 | Criminal Investigator Training Program, Federal Law Enforcement Training Center, Glynco, Georgia |

## EXPLOSIVES SPECIALIST TRAINING

| | |
|---|---|
| 2007 | Fort A.P. Hill, Bowling Green, Virginia (80 hours Explosives Recertification) |
| 2006 | Introduction to Mine Rescue and Abandoned Mines (Office of New Mexico State Mine Inspector) |
| 2005 | Mine Safety and Health Administration Hazard Training, Surface and Coal Mining, Lee Ranch Coal Company, Grants, New Mexico |
| 2005 | ATF Advanced Explosive Destruction Techniques, Fort AP Hill, Bowling Green, VA (80 hours) |
| 2005 | Advanced Bomb Disablement Training, Sandia National Laboratories |
| 2004 | Fort A.P. Hill, Bowling Green, Virginia (80 hours Explosives Recertification) |
| 2004 | Electronics Fundamentals Course, United States Department of State, Diplomatic Security Service |
| 2004 | ATF Advanced Explosives Investigative Techniques (Post Blast), Fort AP Hill, Bowling Green, VA |
| 2003 | ATF, Chemistry of Pyrotechnics and Explosives |
| 2003 | Hazardous Materials Incident Response Operations, meets 29 CFR 1910.120(e) (3) (i); EPA |
| 2002 | ATF State and Local Post blast Investigation |

| 2002 | ATF Certified Explosive Specialist Basic Course, Fort AP Hill, Bowling Green, VA |
| 2002 | Level One, Practical Blasting Fundamentals, International Society of Explosives Engineers |

## MILITARY EXPERIENCE

| 1976 – 1984 | Active Duty USMC |
| 1984-1988 | USMC Reserve |

## INSTRUCTOR EXPERIENCE

Authorized (prior to retirement) by ATF as an instructor in the following areas:
- ❖ Journeyman Special Agent Skills
- ❖ Adult and Youth Gangs
- ❖ Complex Conspiracy Investigations
- ❖ Certified Explosives Specialist
- ❖ Explosive Investigative Techniques
- ❖ Explosive Handling
- ❖ Post Blast Investigative Techniques

| 2006 | Instructor, Post Blast Training, Baghdad, Iraq |
| 2006 | Assistant Instructor, ATF Explosive Specialist Recertification, Fort AP Hill, VA |
| 2006 | Assistant Instructor, ATF Advanced Explosive Destruction Techniques, Fort AP Hill, VA |
| 2005 | Peer Instructor, ATF Explosive Specialist Recertification, Fort AP Hill, VA |
| 1983-1984 | United States Marine Corps, Close Combat Instructor, Parris Island, SC |
| 1982-1983 | United States Marine Corps, Nuclear, Biological, Chemical Warfare Defense Instructor, Parris Island, SC |
| 1980-1982 | United States Marine Corps, Platoon Drill Instructor, Parris Island, SC |

## PROFESSIONAL ORGANIZATIONS

International Association of Bomb Technicians and Investigators
Federal Law Enforcement Officers Association

## AWARDS AND COMMENDATIONS

**2008**

**US Attorney District of New Mexico, Royal Canadian Mounted Police and ATF**

**Certificate of Appreciation**
For assistance in U.S. v. Reumayr Terror Investigation; US District Court, District of New Mexico, case number 1:1999-CR-01338 (plot to bomb sections of the Alaska Pipeline)

**2006**

**United States Attorney, District of New Mexico**
**Certificate of Commendation**
Awarded for the investigation involving the recovery of 500 pounds of stolen high explosives and the arrests of those responsible

**ATF Foreign Service Medal**
Awarded for serving as an explosives instructor in Baghdad, Iraq

**ATF Director**
Recognizing successful investigative work

**ATF Special Act Award**
Award Awarded for outstanding contributions to the effective and efficient operations of the Department of Justice

**2005**

**ATF Special Act Award**
Awarded for outstanding contributions to the effective and efficient operations of the Department of Justice

**2004**

**FBI**
Awarded for outstanding assistance to the FBI

**2003**

**ATF Special Act Award**
Group award for investigations

**2002**

**ATF Special Act Award**
Awarded for noteworthy contributions to the effective and efficient operations of the Department of the Treasury

**2000**

**Federal Law Enforcement Officers Association**

Investigative Excellence Award for the year 2000

**1999**

**International Narcotic Enforcement Officers Association**
Commendation Award

**United States Attorney Southern District of Texas**
Letter of Appreciation for being a speaker at the Southwest Regional Organized Crime Drug
Enforcement Task Force Conference

**United States Secret Service**
Letter of Appreciation for protective mission of First Lady

**Nominated, Treasury Law Enforcement Employee of the Year**

**ATF Letter of Commendation**
Regarding complex federal gang investigation training

**1996**

**ATF Special Act Award**
For noteworthy contribution to the effective and efficient operation of the Department of the
Treasury

**Chief of Police, Albuquerque Police Department**
Letter of Appreciation regarding successful prosecution of a violent street gang

**1989**

**ATF Group Award**
Award regarding successful prosecution of a bombing case with two fatalities

**1989**

Ariel Rios Memorial Award ATF New Agent Training Academy Award

# Exhibit

# 2

| Make / Model | # Sold |
|---|---|
| Del-Ton, model DTI-15, 5.56mm rifle | 2 |
| Romarm Cugir, model GP WASR-10, 7.62x39mm rifle | 1 |
| Romarm Cugir, model GP WASR-10UF, 7.62x39mm rifle | 1 |
| | |
| Ceska Zbrojovka (CZ), unknown model, 7.62x39 mm pistol | 4 |
| Romarm Cugir, model Draco AK-47, 7.62x39 mm pistol | 108 |
| | |
| Fabrique Nationale de Herstal, model Five-Seven, 5.7x28 mm pistol | 1 |
| Kel-Tec CNC, model P3AT, .380 caliber pistol | 2 |
| Makina Ve Kimya Endustrisi Kurumu, model American Tactical 92, 9mm pistol | 58 |
| Makina Ve Kimya Endustrisi Kurumu, model American Tactical C92, 9mm pistol | 21 |
| Smith & Wesson, model SW40VE, .40 caliber pistol | 1 |
| Springfield Armory, model XD45, .45 caliber pistol | 1 |
| Taurus International, model PT22, .22 caliber pistol | 1 |
| Taurus International, model PT738, .380 caliber pistol | 1 |
| Twin Pines Inc., model Rock Island 1911A1, 9mm pistol | 1 |

CERTIFIED MAIL™

||||| 7012 2210 0001 2671 7007

IAN M. GARLAND
60687051
FEDERAL PRISON CAMP
PO BOX 700
YANKTON, SD 57078



















RECEIVED
At Albuquerque NM

MAY 2 9 2013

MATTHEW J. DYKMAN
CLERK

LEGAL MAIL

SPECIAL MAIL/LEGAL MAIL

**U.S. DISTRICT COURT D.N.M.**
**ATTN: CLERK**

⟡60687-051⟡
Us District Court Dnm
333 Lomas BLVD NW
Suite 333
Albuquerque, NM 87102
United States

FEDERAL PRISON CAMP
P.O. BOX 680
YANKTON, SD 57078 DATE: 5/23/13

THE ENCLOSED LETTER WAS PROCESSED THROUGH SPECIAL MAILING
PROCEDURES FOR FORWARDING TO YOU. THE LETTER HAS NEITHER BEEN
OPENED NOR INSPECTED. IF THE WRITER RAISES A QUESTION OR PROBLEM
OVER WHICH THIS FACILITY HAS JURISDICTION, YOU MAY WISH TO RETURN THE
MATERIAL FOR FURTHER INFORMATION OR CLARIFICATION. IF THE WRITER
ENCLOSES CORRESPONDENCE FOR FORWARDING TO ANOTHER ADDRESSEE,
PLEASE RETURN THE ENCLOSURE TO THE ABOVE ADDRESS.